GEORGE D. ENGLEHART, Appellant, v. JOSEPH A. SERENA and VERNON CHAPMAN.—300 S. W. 268.

Court en Banc, December 2, 1927.

264

*Spradling & Dalton* for appellant.

*Gallivan & Finch* and *Ward & Reeves* for respondents.

268

RAGLAND, J.—This case comes to the writer for opinion on reassignment. It is an action for damages for the alleged wrongful expulsion of plaintiff from the boys' dormitory of the Southeast Missouri State Teachers' College, where he was a student. At the time of the occurrence defendant Serena was president of the institution, and defendant Chapman was superintendent of buildings and grounds. The latter was also a commissioned police officer of the city of Cape Girardeau. After all the evidence was in, for both

plaintiff and defendants, the trial court directed a verdict for defendants. From the judgment entered in accordance therewith plaintiff prosecutes this appeal.

Appellant insists, and rightly, that in determining whether the trial court was warranted in sustaining the demurrer to the evidence "all inferences favorable to the plaintiff from the evidence as a whole must be considered and all countervailing inferences rejected." For the purpose of this review, therefore, the facts will be gathered from the plaintiff's evidence and such portions of the defendants' as have been pointed out by appellant as aiding or supplementing his own. In addition to such facts, however, there are others disclosed by defendants' evidence which might be termed "neutral," which were uncontroverted at the trial and which from the statements, briefs and printed arguments of counsel on both sides seem to be tacitly conceded. These facts, as they tend to throw light on those in dispute, will be embodied in the statement of facts which is to follow.

The Southeast Missouri State Teachers' College, located at the city of Cape Girardeau, is an institution maintained by the State for the purpose primarily of educating and training teachers. It is under the control and management of a board of regents invested with full power to make and adopt all needful rules and regulations for the guidance and supervision of all students while enrolled as such. Used in connection with the college and constituting a part of its equipment, there was, during the Summer Term of 1923, a boys' dormitory known as Albert Hall. During that time seventy-five or eighty men students lodged and took their meals there. The most of them were teachers, some were superintendents of schools, while others were principals of high schools. The housekeeping arrangements of the Hall were in charge of a matron, but with respect to the conduct of the student inmates an honor system had been inaugurated and was then in effect. Subject to the general supervision of the president and faculty, the maintenance of order and discipline was in the hands of a student government, the personnel of which was made up of occupants of the Hall. There were a president and secretary of the student council, and also monitors whose duty it was to report infractions of the rules.

Among the rules promulgated by the student body for the government of Albert Hall was one to the effect that any wilfull act which destroyed property, or which disturbed the peace and quiet of the Hall, should be deemed an offense. Lights at the Hall were turned out by the college authorities at eleven P. M. On March 17, 1923, there was put on the bulletin board at the dormitory the following notice, over the signature of the President of the College:

"To the Boarders in Albert Hall:

"My attention has been called to the fact that the men at Albert Hall have been returning to the Hall after the lights go out. It is

needless to say that this is against all college rules and precedent. Hereafter each student must be in the Hall by eleven o'clock P. M. unless he has written permission of the Matron of the Hall to be out later. This rule is effective immediately and any man who feels that he cannot abide by it is at perfect liberty to move out of the Hall at once—in fact he is requested to do so.

"Furthermore, my attention has been called to the fact that the men have been disturbing the rest and peace of the Hall by making noise. The use of firecrackers is a fire hazard that should not be indulged in, nor any other firearms used in the Hall. All noise must be eliminated for the good of the Hall itself. Upon the discovery of any man who causes a disturbance during the quiet hours of the Hall, he too will be compelled to leave immediately."

The Summer Term of 1923 closed August 2nd. As the end of the term approached occurrences took place in Albert Hall which were described by some of plaintiff's witnesses as "pranks," and by others as a "jubilee," but they can be more appropriately characterized as near riots. On three successive nights, the nights of July 28th, 29th and 30th, after the lights were out bedlam broke loose. A frightened dog with a can tied to its tail ran yelping up and down the corridors; firecrackers were exploded in the hall to such an extent that people in the immediate vicinity thought a bombardment was going on; water was thrown over the transoms on the merry-makers out in the halls; and all the while a victrola played "Barney Google," played that and nothing else. On one of the nights the president and secretary of the student body secured the offending victrola and took it to the president's room. It was there recaptured by a squad of twenty or more, reinstated in its former location, and thereafter it continued without interruption to play "Barney Google" until the small hours of the morning. Whether all the things just mentioned occurred on each of the nights referred to cannot be determined from the evidence, but apparently the "jubilee" reached its peak on the night of July 30th, when it lasted the greater part of the night. Plaintiff had no part or share in it; he was a model student; he was not even disturbed by it; in fact, he slept through most of it. But nearby dwellers were disturbed; aroused from their sleep they came to open windows and out onto porches to listen in wonderment. From them came reports to the President of the College, in some instances complaints, with reference to what was taking place nightly in Albert Hall.

On July 31st the president took counsel with the dean, and perhaps other members of the faculty, for the purpose of determining the best course to be pursued in dealing with what he considered an emergency. The Board of Regents had previously ordered that at the end of the then current term Albert Hall should be converted into

a girls' dormitory. The president and the dean debated whether or not they should immediately close the building as a dormitory for boys. After fully canvassing the matter it was decided to keep the dormitory open the remaining two days of the term, if as many as twenty of the occupants would sign a written pledge to properly conduct themselves during that time. Word was communicated to the lodgers of the Hall through the matron, and twenty-seven of them, including plaintiff, went over to the president's office and signed a paper of which the following is a copy:

"An emergency having arisen owing to a number of men, whose names are unknown, disturbing the peace of Albert Hall and the neighborhood as well, it is hereby declared necessary to close the Hall except to those who are desirous of remaining in the Hall until August 2 and are willing to sign this paper:

"I promise, upon my honor, if I am permitted to remain in Albert Hall until August 2, 1923, that I will conduct myself as a gentleman. I agree not to abuse the property of the State nor to disturb the peace of others in this Hall, and in every manner to live up to the rules of Albert Hall."

At noon that day, after the twenty-seven had signed, defendant Serena, in his capacity as President of the College, went to Albert Hall with the pledge paper in his hand and made a short speech to the men while they were at lunch. For the substance of his speech and a description of his demeanor on that occasion we quote from plaintiff's testimony: "He said he had a paper there in his hand he expected, or demanded, every student to sign if they were going to remain in the dormitory, by three o'clock, or get out by six, or he would put them out. He said he would put them out by force and if necessary he knew how to get rough. He said he would have the police up there if necessary to enforce order, and see we got out of that place or were put out. . . . He said he was fully aware that ninety per cent of the men in the dormitory had absolutely nothing to do with the shooting of firecrackers, but they must sign this pledge by three o'clock or get out by six. Every student in the hall must sign it. He made reference to someone being yellow. He said any man that shot firecrackers in the hall and signed that pledge would be yellow, and he hoped no man in there was yellow enough to sign that paper, if he had shot firecrackers, but he wanted him to get out. He said every student in the hall must sign the paper if he wanted to stay in the hall, by three o'clock or get out by six, whether they had anything whatsoever to do with the disturbance or not. . . . He appeared angry; his face was flushed, got up to make his speech and pounded the table, waved his hands, waved the paper, stamped his feet—made it very impressive—that what he said was law. He said he wanted us to know that he knew how to pull rough stuff; he

didn't want anybody to get rough, because if they did he knew how to pull rough stuff and he would show us how. His appearance and attitude at the time he made that statement was very much the same as before; shaking his fists, and pointed, not at any particular student, but at the students in general, pointed at everyone in there, and making it as impressive as he could, with his face flushed and anger written all over his countenance."

After the president's speech the plaintiff erased his signature from the paper. With respect to that action he testified: "My objection to my name remaining on it was that I was admitting if I signed that that I had been abusing the State's property and hadn't been a gentleman." Sometime during the afternoon plaintiff consulted an attorney as to his rights in the premises. That night about ten o'clock defendant Chapman came to his room and told him that in accordance with the order of the president he would have to vacate. A lengthy colloquy ensued with respect to plaintiff's asserted right to the continued use of the room and Chapman's authority to put him out. Finally, Chapman, who was accompanied by a police officer and who himself wore a police badge, told plaintiff that if he did not get out he (Chapman) would put him out. Plaintiff thereupon left and went to a hotel. He had previously paid for the use of the room and for board up to August 2nd. During the colloquy just referred to Chapman told plaintiff to call upon the financial officer of the dormitory who stood ready to refund the money for the unexpired time. That plaintiff declined to do. The next day he came for his books and papers; and on the next day or the one following he got his clothes. He was in no way molested on the occasions of these visits.

After his expulsion from the dormitory plaintiff took the examinations which in due course followed the completion of the work of the Summer Term. He received a certificate of graduation; and also a return of the cash deposit to secure the State against loss of or injury to its property, required of all students who occupied the dormitory.

The petition in the cause concludes as follows:

"That said forcible refusal to permit plaintiff to occupy and use his said room and the forcible exclusion of the plaintiff therefrom and from his said property (books and clothing) without just cause, reason or excuse was calculated to mortify, humiliate, embarrass and injure the plaintiff and so resulted, and was done under the direction and order of the defendants, and defendants acted wilfully, maliciously and with intent to injure the plaintiff.

"Wherefore, plaintiff says that he has been actually damaged in the sum of three thousand dollars, for which and for costs he prays judgment against defendants, together with punitive damages in the sum of five thousand dollars."

One of the grounds on which appellant seeks a recovery of damages is that he was deprived of the "possession" of the room he was occupying in the dormitory before the expiration of the period for which he had paid "rent." He was not, however, a tenant in any sense of the word. He did not have even the full and unrestricted rights of a lodger, because Albert Hall was not an ordinary lodging house. It was an auxiliary of the college, and was maintained and conducted in furtherance of that institution's general purposes. When appellant took up residence there, he impliedly agreed to conform to all reasonable rules and regulations for its government which were then in force or which might thereafter be adopted by the proper authorities. The power to make all needful rules and regulations for the guidance and supervision of the conduct of the students of the State Teachers' College is vested by statute in a board of regents (Sec. 11498, R. S. 1919), but where that body has not made such rules and regulations the president of the college has authority to do so. That power inheres in his office. [Deskins v. Gose, 85 Mo. 487.] If appellant has sustained any legal injury it is because of the nature of the rule promulgated by the president on July 31st, or the manner of its enforcement.

The discretion with which school authorities are clothed with respect to the discipline, management and government of the institution committed to their supervision is in the nature of a judicial discretion. And the adoption and enforcement by them of a rule, falling within the general scope of their discretion, can afford no basis for an action for damages against them, unless the rule, or the manner in which it is enforced, is so palpably unreasonable, arbitrary and oppressive as to give rise to an inference of malice. [Dritt v. Snodgrass, 66 Mo. 286; Deskins v. Gose, supra.]

The situation which confronted the President of the Teachers' College has been described. Not only was there a continuing breach of discipline intolerable in itself, but through it the lives of the inmates of the dormitory, as well as the State's property, were imperiled. There was an imperative necessity for putting to an end the fire hazard resulting from the explosion of firecrackers in the unlighted halls over their oil-soaked, partly rug covered, pine floors. Who were actively contributing to the conditions which had arisen he did not know. Apparently he was surrounded by a conspiracy of silence. But the fact is that every student in the dormitory was morally responsible for what was taking place there, unless their student government was wholly a fiction. In view of the situation with which he was faced the President would have been fully justified in closing the dormitory then and there. [Arnold v. School District, 78 Mo. 233; In re Rebenack, 62 Mo. App. 8.] Instead of doing that, however, he permitted it to remain open to those, and only those,

who would give personal pledges to properly conduct themselves during the remainder of the term. The condition prescribed cannot be regarded as unreasonable; certainly no inference of malice can be drawn from its imposition.

Defendant Serena's speech in promulgating his order, in connection with his manner of delivering it, is stressed as having been unnecessarily harsh and offensive and calculated to humiliate and affront those to whom it was addressed. But it is clear that the situation called for blunt, emphatic statement; indignation on the part of the defendant was fully justified. Anger, of course, was out of place; but the exhibition of it disclosed by the record was not, all the circumstances considered, any evidence of malice.

Only constructive force was used by defendant Chapman in carrying out the President's order. A situation requiring its employment was apparently brought about by appellant himself for the purpose of laying a foundation for this action.

The judgment of the circuit court is affirmed. All concur, except *Graves, J.,* who dissents.